**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                          No: 2:20-cr-00980-RB-1

JONATHAN OCON,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

Defendant Jonathan Ocon was charged in New Mexico state court for: (1) breaking and entering; (2) aggravated battery (strangulation/suffocation); and (3) aggravated battery against a household member. Given the ongoing nature of the COVID-19 pandemic, the state matter is still pending. These offenses violated the terms of Ocon's supervised release from federal prison, so the U.S. District Court for the District of New Mexico issued a Petition for Revocation of Supervised Release as a result. An evidentiary hearing held on July 21, 2020 sought to clarify the severity of these charges to determine the length of the prison sentence. Given that the hearing showed, through a *preponderance of the evidence*, that Ocon committed aggravated battery through strangulation, his offenses rose to the level of Grade A violations in breach of his supervised release.

**I.**      **Background**

On May 3, 2007, Ocon pleaded guilty to "Kidnapping, and aiding and abetting a kidnapping" and "Using, Carrying, and Brandishing a Firearm During and in Relation to, and Possessing and Brandishing in Furtherance of a Crime of Violence" in the Western District of Texas. (Doc. 1-3.) Judge David Briones sentenced Ocon to 96 months for the kidnapping offense

and 84 months for the brandishing a firearm offense, served consecutively (180 months total). (*Id.*) Ocon's supervised release from prison depended on his meeting certain conditions. Specifically, he was not to "commit another federal, state, or local crime." (*Id.* at 4.)

Upon his release, Ocon began a friendship with Miriam Zapata; however, Zapata believed that the relationship progressed too quickly and sought to distance herself from Ocon. (Doc. 24 (Tr.) 11:16–24, 12:10–20.) On March 15, 2020, at approximately 1:30 AM, Ocon arrived at Zapata's home. (Tr. 14:8–25.) Zapata heard a "loud, hard, strong knocking" at her front door. (Tr. 14:22–23.) Ocon continued to pound on and kick the door to the point where Zapata's walls and picture frames were shaking. (Tr. 15:6–8.) Believing that Ocon would kick the door open and destroy it, Zapata unlocked and opened the door. (Tr. 15:16–25.) Once opened, Ocon "just came straight at" her. (Tr. 16:1–2.) At that instant, Zapata was not sure whether he "grabbed [her] by [the] neck" or "slapped [her] across [her] face." (Tr. 16:1–4.) Zapata claimed that he was under the influence of alcohol at the time. (*Id.*) Zapata further stated that she "felt his hands on [her] neck, just taps on my head and across my face." (Tr. 16:15–16.) During the altercation, Ocon hit her face, pulled her hair, and grabbed her neck. (Tr. 19:7–9.) In addition, Ocon "pulled a big chunk of [her] scalp on [her] left side." (Tr. 18:4–5.)

During the encounter, Zapata claimed that while she was physically hit, she fell to the floor "[a]nd for a couple seconds, [she] just saw like dots, you know, like [she] didn't see clear for a . . . few seconds there." (Tr. 18:19–25.) Further, she "just landed on the floor and hit [her] head on the floor. And [she] just felt like [she] was unconscious there for a minute." (Tr. 19:1–4.) After about ten minutes into the assault, Ocon left. (Tr. 20:15–25.) Once he was gone, Zapata attempted to close the door, but "the door wouldn't shut right." (Tr. 20:22–25.) Zapata claimed that this was the

result of Ocon kicking the door for a prolonged period. (Tr. 21:1–15.) Though Zapata never physically saw Ocon kick it, there were footprints on the door. (Tr. 23:9–10.)

After Ocon left, Officer Tyrel Jackson and a paramedic team arrived at Zapata's home. (Tr. 25:2–8, 26:1–5.) Though Zapata never went to the emergency room or a physical doctor's office, she stated that the bruising resulted from Ocon's hands around her neck. (Tr. 28:5–9.) Upon inspection, Jackson recognized footprints on the door and noticed that the door was starting to detach from the doorframe. (Tr. 33:16–20.) In assessing Zapata's injuries, Jackson noticed that:

> There were injuries to her top and lower lip, bruising and swelling. There was also redness and bruising and finger marks on her neck, which indicated strangulation. And there was also a bald spot on the top of her head. . . . There was about an inch circumference of bald scalp with dried blood on it.

(Tr. 35:17–25.)

Defendant Ocon was charged with (1) breaking and entering; (2) aggravated battery (strangulation/suffocation); and (3) aggravated battery against a household member. Those charges are still pending in New Mexico state court. Meanwhile, the U.S. District Court issued a Petition for Revocation of Supervised Release on April 9, 2020, as a result of these violations. (Doc. 5.) A question arose as to whether these offenses constituted felonies or misdemeanors, and the Court held an evidentiary hearing on July 21, 2020, directing the parties to brief the matter afterward.

**II.   Legal Standard**

When conditions of supervised release are violated, the Court may:

> revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release . . . if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a *preponderance of the evidence* that the defendant violated a condition of supervised release . . . .

18 U.S.C. § 3583 (emphasis added). Under these circumstances, preponderance of the evidence means,

> The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by the evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to include a fair and impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," *Black's Law Dictionary* (8th ed. 2004).

The additional prison time is based on the seriousness of the offense that prompted the revocation. *Id.* There are three grades of violations. Grade A, the most serious, include "federal, state, or local offense[s] punishable by a term of imprisonment exceeding one year that . . . is a crime of violence . . . ." U.S.S.G. § 7B1.1. Grade B violations include "conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year," and Grade C violations include "federal, state, or local offense[s] punishable by a term of imprisonment of one year or less; or . . . a violation of any other condition of supervision." *Id.*

**III.   Discussion**

    **a.  Breaking and Entering**

First, Ocon believes that he did not commit a breaking and entering, which would constitute a Grade B violation. (Doc. 26 at 4.) New Mexico has codified breaking and entering in the following way:

> Breaking and entering consists of the unauthorized entry of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, where entry is obtained by fraud or deception, or by the breaking or dismantling of any part of the vehicle, watercraft, aircraft, dwelling or other structure, or by the breaking or dismantling of any device used to secure the vehicle, watercraft, aircraft, dwelling or other structure.

N.M. Stat. Ann. § 30-14-8. In *State v. Holt*, the Supreme Court of New Mexico assesses the language of this statute using a purposive approach, asking whether there was entry into the

4

dwelling's protected areas. 368 P.3d 409, 413 (N.M. 2016). This prompts an inquiry into the nature of the enclosure and any associated right to privacy. *Id.* (holding that "putting one's fingers behind a window screen affixed to a residential dwelling is an intrusion into an enclosed, private, prohibited space and constitutes an "entry" for the purposes of New Mexico's breaking-and-entering statute"). New Mexico Jury Instructions provide that "the least intrusion constitutes an entry." UJI 14-1410 NMRA; *see also State v. Ryan*, No. A-1-CA-37358, 2019 WL 1226019, at *1 (N.M. Ct. App. Feb. 7, 2019) (finding a breaking and entering where defendant made a minor cut in a window screen); *State v. Tixier*, 551 P.2d 987, 988 (N.M. Ct. App. 1976) (finding an entry when defendant activated a burglary alarm "one-half inch inside the garage door" of the facility).

Breaking and entering is a felony punishable by jail time of greater than one year and would constitute a Grade B violation. Defendant contends that because Zapata opened the door, Ocon could not have committed breaking and entering, and any argument suggesting that Ocon would have kicked the door down is speculative. (Doc. 26 at 6–7.) The elements of breaking and entering require a "breaking" in addition to entry; thus, Ocon could at most face an attempted breaking and entering charge. (*Id.*)

Despite Ocon's argument, in New Mexico, the threshold for breaking and entering is low. The evidentiary hearing revealed that Ocon repeatedly pounded on and kicked the door in an attempt to enter the home. When Officer Jackson arrived, he viewed footprints on the door, as well as a cracked doorframe. Under New Mexico law, the cracked doorframe is sufficient to constitute a breaking and entering because Ocon encroached on to Zapata's protected space—even if the broken doorframe encroached by a fraction of an inch. Less severe intrusions on a dwelling have constituted breaking and entering. For instance, in *Ryan*, a minor cut in a window screen resulted in breaking and entering, 2019 WL 1226019, at *1, and in *Tixier*, the court found breaking and

entering after an alarm "one-half inch" inside the facility was triggered, 551 P.2d at 988. Even if Ocon walked away without entering Zapata's home, the cracked doorframe constitutes a breaking and entering under New Mexico law. While Ocon questions the sufficiency of the evidence, the standard for revocation is *preponderance of the evidence*, and that has been met here.

### b. Aggravated Battery (Strangulation/Suffocation)

Next, Ocon argues that the Government cannot make out the elements needed to prove felony-level aggravated battery—a Grade A violation. (Doc. 26 at 7.) New Mexico provides a definition for aggravated battery, with a specific provision for strangulation. It reads as follows:

> Aggravated battery against a household member consists of the unlawful touching or application of force to the person of a household member with intent to injure that person or another.
>
> . . . .
>
> Whoever commits aggravated battery against a household member is guilty of a third degree felony if the aggravated battery against a household member is committed:
>
> (1) by inflicting great bodily harm;
> (2) with a deadly weapon;
> (3) by *strangulation or suffocation*; or
> (4) in any manner whereby great bodily harm or death can be inflicted.

N.M. Stat. Ann. § 30-3-16 (emphasis added). Here, strangulation is "the unlawful touching or application of force to another person's neck or throat with intent to injure that person and in a manner whereby great bodily harm or death *can be inflicted*, the result of which impedes the person's normal breathing or blood circulation." N.M. Stat. Ann. § 30-3-11 (emphasis added). And suffocation means "the unlawful touching or application of force that blocks the nose or mouth of another person with intent to injure that person and in a manner whereby great bodily harm or death *can be inflicted*, the result of which impedes the person's normal breathing or blood circulation." *Id.* (emphasis added).

Ocon argues that the "only evidence presented at the evidentiary hearing regarding the injuries sustained by Ms. Zapata or manner in which they were inflicted, is the testimony of Ms. Zapata and Las Cruces Police Officer Jackson." (Doc. 26 at 9.) Ocon believes that Zapata was not clear in her testimony—never describing "a loss of consciousness as a result of impeded blood flow or obstruction of normal breathing." (*Id.*) Ocon also believes that aggravated battery requires "a high probability of death." Ocon misinterprets the statutory scheme, however. First, aggravated battery can arise from either "strangulation *or* suffocation." Strangulation requires (i) unlawful touching of the neck; (ii) intent to injure in a manner where great harm "can be inflicted"; and (iii) the action impedes that individual's normal breathing. Felony battery merely requires actions that "can" result in "great bodily harm or death. N.M. Stat. Ann. § 30-3-5.

The hearing offered ample testimony to support this charge. While Ocon is correct that Zapata could not definitively state whether he grabbed her neck when she was first attacked, (Doc. 26 at 9), several other statements in Zapata's testimony confirm the strangulation. When Zapata was asked where Ocon touched her in the altercation, she stated "mainly like my face, my hair, my . . . head. And well, of course, my neck." (Tr. 19:7–9.) When she was asked what caused the bruising on her neck, she stated, "[f]rom him grabbing my neck." (Tr. 28:6–8.) When she dropped to the floor "she saw dots . . . like [she] didn't see clear [for a] few seconds there." (Tr. 18:19–23.) When Officer Jackson was asked about his impression of Zapata's injuries, he stated that "[t]here was also redness and bruising and finger marks on her neck, which indicated strangulation." (Tr. 35:17–19.) The testimony makes clear that Ocon put his hands around Zapata's neck in a threatening, physical manner. She claimed that she thought she briefly lost consciousness, and the strangulation was serious enough to create marks and bruising. The statute does not require that grave risk *actually* occur, only that it *can* occur. This physical altercation certainly posed a serious

7

and potentially life-threatening risk to Zapata, even if hospitalization and further medical attention were not required.

At the hearing, Defendant relied on *State v. Waldrop*, to argue that strangulation does not necessarily result in "great bodily harm." *See* No. A-1-CA-35967, 2018 WL 4378771, at *4 (N.M. Ct. App. Aug. 20, 2018). However, there are two issues with this case. First, the victim in *Waldrop* did not testify as to the strangulation. *See id.* Rather, the only evidence to support a claim for aggravated battery was in a report produced by a sexual assault nurse examiner, which lacked an adequate description of the assault and could not verify the timeline of events. *See id.* Given the lack of testimony, the State failed to prove each element of the crime beyond a reasonable doubt, specifically that choking resulted in a high probability of death in this instance. *See id.* Nevertheless, in *State v. Hollowell*, the appellate court held that direct testimony of strangulation was sufficient to find a high probability of death. *See* 461 P.2d 238, 242 (N.M. Ct. App. 1969). Second, the burden in *Waldrop* was *beyond a reasonable doubt*, whereas in the current matter, only the lesser *preponderance of the evidence* is required. Given the direct testimony in this matter, as well as the lesser burden of proof, the Court finds that Ocon committed aggravated battery through strangulation. Since Ocon committed this greater offense, it is not necessary to evaluate whether aggravated battery against a household member (a Grade C violation) occurred.

**THEREFORE**,

**IT IS ORDERED** that Ocon committed a Grade A violation in breach of his supervised release.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**